UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUTH ANN COOPER,<br><br>       Plaintiff,<br><br>  v.<br><br>CALERO SOFTWARE, LLC<br><br>       Defendant. | **COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>Civil Action No.: |

Plaintiff, Ruth Ann Cooper ("Cooper"), by her attorneys Leclair Korona Vahey Cole LLP, for action against defendant Calero Software, LLC ("Calero"), states as follows:

## INTRODUCTION

1. Cooper alleges that her former employer, Calero, discriminated against her on the basis of sex when it subjected her to a hostile work environment and harassment, demoted her to a position with less earning potential, terminated her employment, and failed to pay her commissions due and owing, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Equal Pay Act of 1963 under the Fair Labor Standards Act of 1938, 29 U.S.C. § 206, *et seq.*, the New York State Human Rights Act, and New York Labor Law § 194.

2. Cooper also alleges that Calero unlawfully failed to pay her wages due and owing constituting unpaid commissions in violation of the Wage Theft Prevention Act, New York Labor Law §§ 190, *et seq.* and in breach of the parties' contract.

## PARTIES, JURISDICTION AND VENUE

3. Plaintiff Cooper is a resident of the State of Illinois.

4. Defendant Calero is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Rochester, New York.

5. This action is, in part, one for discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and discrimination pursuant to the Equal Pay Act of 1963 under the Fair Labor Standards Act of 1938, 29 U.S.C. § 206, *et seq*. Federal question jurisdiction in this Court is founded upon 28 U.S.C. §§ 1331 and 1343.

6. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because plaintiff's state law claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share common operative facts with her federal law claim, and the parties are identical. Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience and fairness to the parties.

7. This Court also has original jurisdiction over this civil action based upon diversity of citizenship under 28 U.S.C. § 1332(a), in that Plaintiff and defendant are citizens of different states and the amount in controversy exceeds $75,000.00.

8. Venue in this District is proper, pursuant to 28 U.S.C. § 1391(b)(1) and (2), as the defendant resides in this District and a substantial part of the acts giving rise to the asserted claim took place in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. Cooper has exhausted her administrative remedies in that she filed timely administrative charges of discrimination against Calero with the U.S. Equal Employment Opportunity Commission ("EEOC").

10. The EEOC issued a Notice of Right to Sue on June 29, 2016, a copy of which is attached hereto as Exhibit "**A**".

## SUBSTANTIVE ALLEGATIONS

### The Letter Agreement

11. Calero is in the business of providing communication management services.

12. Cooper is an accomplished marketing and sales person.

13. Calero provided Cooper with a letter agreement dated July 10, 2014, agreeing to hire Cooper as an employee with the title Regional Sales Director, with an annual salary of $110,000.00, plus commissions, commencing on July 28, 2014. (The "Letter Agreement").

14. Cooper accepted Calero's offer, and commenced working for Calero pursuant to the terms of the Letter Agreement on July 28, 2014.

15. Calero assigned each sales representative, including Cooper, an annual quota, constituting the minimum amount of total orders a sales person was expected to achieve over the course of the fiscal year.

16. The Letter Agreement states that Cooper's pro-rated annual quota for 2014 was $960,000.00 in direct sales, with total targeted commissions of $130,000.00 in additional pay for meeting the quota.

17. As a Regional Sales Director, Cooper was permitted to pursue direct sales of Calero's top products to existing and prospective customers, and was entitled to earn a substantial commission based on the total contract value.

18.  This is contrasted with salespersons working for Calero as "channel managers", which persons sold Calero's products to resellers, for lesser contract prices, and for which Calero paid a lower commission rate.

### July 2014 – December 2014:  Calero Subjected Cooper to a Hostile Work Environment

19.  Immediately upon commencing her employment in July 2014, Cooper began to implement and execute her plan for the region, performing due diligence and scheduling presentations and demonstrations with prospective customers.

20.  One of the larger projects that Cooper sought was a substantial contract with a Fortune 50 company, referred to herein as "Client C".  (The names of actual customers and/or their representatives are not included herein to protect any potential confidentiality concerns.)

21.  Cooper performed due diligence with respect to Client C and then coordinated a meeting with representatives of Client C for November 7, 2014.

22.  Cooper informed executives of Calero that she had scheduled the meeting, and none of the executives chose to attend or assist with the presentation.

23.  Prior to the November 7, 2014 meeting with Client C, Cooper was not informed that any of Calero's executives wished to be present during the upcoming meeting.

24.  During the November 7, 2014 meeting with Client C, Cooper led the presentation, and one of Calero's engineers provided a demonstration of the subject product remotely.

25.  The presentation was a success, and Client C's representatives requested that Cooper move forward with providing pricing and a custom demonstration.

26. On November 8, 2014, Cooper's male supervisor Kevin Wood, Chairman of the Board of Calero ("Wood"), sent Cooper an email stating: "given the size and complexity of this opportunity", the following male executives and employees of Calero would "need to be intimately involved in this process": Tony Mazzulo (Executive Vice President of Expense Management) ("Mazzulo"), Will Nankivill (Vice President of Mobility), and Mike Lucania (Director of Enterprise Solutions Consulting) ("Lucania"), and that Chris Jurasek (CEO) ("Jurasek") and Wood (who are also males) would "also stay closely involved."

27. On November 12, 2014, Cooper scheduled a telephone call with Mazzulo to discuss pricing. During the call, Mazzulo screamed at Cooper, berating her for leading the presentation to Client C and insisting that he should have been present at the first meeting.

28. Calero's discriminatory hostility toward Cooper continued on November 20, 2014, when Wood called Cooper and told her that, allegedly, Client C's representative (referred to herein as Ms. C) told Lucania that Cooper was "aggressive", that Ms. C requested that Lucania be the lead salesperson on the deal, and that Ms. C asked Lucania not to tell Cooper. Wood further stated that, from this point forward, Lucania would work in tandem with Cooper to move forward on this sale.

29. Two other representatives of Client C subsequently confirmed to Cooper that Ms. C never said the things alleged by Wood and Lucania above.

30. Additionally, contrary to Wood's representations, Lucania failed to work "in tandem" with Cooper and refused to include Cooper in ongoing communications with Client C.

31. On December 15, 2014, Cooper learned that Lucania scheduled a meeting with Client C for December 16, 2014, and he failed to inform Cooper about the meeting or invite her to attend. Cooper insisted on attending the meeting via telephone. Ms. C sent Cooper an email indicating that she was "shocked" that Cooper was not attending the meeting in person.

**December 15 to December 18, 2014:  Calero Disparaged  
Cooper and Other Female Employees During Team Meetings**

32. During a series of dinners and meetings in December 2014, Calero's male executives continued to treat Cooper and other female employees in a derogatory and disrespectful manner.

33. On December 15, 2014, Cooper attended a team dinner with members of her Calero team, which was led by male executive Andrew Taylor, Calero's Executive Vice President of Sales ("Taylor").

34. Although both male and female employees were present during the dinner, Taylor only conversed with the male members of the team. Cooper made numerous attempts to engage Taylor in conversation, and he completely ignored her.

35. Following the dinner, Gerry Henderson, the Regional Sales Director for the southwest region ("Henderson"), told Cooper that she was "aggressive" because she asked Taylor about his intentions with respect to global strategy.

36. The next day, on December 16, 2014, Cooper attended a team meeting that was also led by Taylor.

37. Throughout the entire meeting on December 16, 2014, Taylor only listened to the male employees present and disregarded virtually everything that Cooper

and the other female employees stated.  When Cooper presented her plan for 2015 to the group, and Taylor stated "you don't know how to do math."

38. On December 16, 2014, Cooper attended another team dinner along with Taylor, two male regional sales directors (Henderson and Richard Ferris ("Ferris")), and one other female sales person.

39. At the December 16, 2014 meeting, once again, Taylor only conversed with the male employees and ignored the female employees.  The other female employee told Taylor:  "Andrew, I am not going to take this, you are not listening to anything that Ruth [Cooper] and I have to say.  You may as well of just had this dinner with Richard and Gerry."  Taylor stated that the female employee and Cooper were being too sensitive, and Taylor, Henderson, and Ferris laughed at the two women.  Cooper and the other female employee were forced to leave the dinner meeting at that point because they were being ridiculed.

40. On December 17, 2014, Cooper attended a dinner with Calero's senior leadership team.  All of the other attendees were male, and consisted of Taylor, Nankivill, Waters, Jason Uzzel (Executive Director of Channel Sales), Erik Schultz (Chief Marketing Officer), and Jim Fitzgibbons.  Taylor once again ignored everything that Cooper said during dinner.  Following dinner, the attendees were conversing at the hotel bar, and Taylor continued to disregard everything that Cooper said.  When Cooper tried to speak, Taylor talked over her and put his hand up indicating that she should stop talking.  Cooper again tried to join the conversation, and Taylor put his hand up directing her to stop talking, and said "I am not going to discuss this subject with someone who is not educated!"

41.     The next day, on December 18, 2014, Cooper meet with Wood and told him how Taylor disrespected her and the other female employees during the team meeting and dinners as described above.

42.     On December 18, 2014, Cooper met with Taylor and asked him if she had done anything to offend him.  Taylor stated "you don't know my humor," and told Cooper "oh Ruth, I'm sorry, you're being sensitive, and hey – I was drunk."  Cooper told Taylor that she did not want their professional relationship to "kick off on this foot."  She went through her plan for 2015, and Taylor stated that she was on track and should continue what she was doing.

43.     Cooper was subsequently advised by other female employees at Calero that the company is male-centric, does not like strong women, and labels strong women as "aggressive", and that the senior leadership has made gender slurs about the female employees.

**January 2015 – Calero Refused to Provide Necessary Assistance to Cooper**

44.     In January 2015, Calero continued its discriminatory practices against Cooper by refusing to provide the support that she needed to close the substantial deal with Client C.

45.     Lucania and Taylor were tasked with providing and finalizing the pricing for the contract with Client C.  Cooper did not have the authority to agree to pricing, and she needed Lucania and Taylor to assist her by providing this information.

46.     Throughout the first three weeks of January 2015, Cooper made numerous attempts to obtain the pricing information for Client C from Lucania and Taylor, and both men failed to respond or provide the requested information.

47. On January 26, 2015, Cooper attended a Calero sales conference in Atlanta, Georgia. During the conference, Cooper asked Lucania and Taylor to provide the pricing information that she needed for a telephone call scheduled for the next day with Client C. Rather than providing the requested information to assist with the sale, Lucania and Taylor verbally attacked Cooper in front of several colleagues from Calero. Taylor stated that Cooper should "do the [expletive] math."

48. On January 27, 2015, Cooper sent an email and multiple text messages to Wood asking for assistance with pricing since Lucania and Taylor failed to do so. Like the other two male executives, Wood (who is also male) likewise failed to respond to Cooper. Wood then proceeded to avoid Cooper for the remainder of the sales conference.

49. With the deadline looming, on January 29, 2015, Cooper organized a meeting with all of the senior executives (Wood, Jurasek, Mazzulo, Taylor, and Lucania) to discuss pricing for Client C. Lucania haphazardly wrote several columns of numbers, percentages, and prices on a white board, took a photograph of the white board, and told Cooper to "figure it out." Cooper was unable to decipher Lucania's cryptic writing. Cooper asked Lucania several times that day and during dinner that evening to send her the proposal in a format that she could understand and deliver to Client C; Lucania stated that he would provide the pricing information, but never delivered same.

50. At 7:00 a.m. on January 30, 2015, the day of Client C's noon-deadline, Cooper once again asked Lucania to send the pricing, and Lucania agreed to provide same. In actuality, Lucania once again failed to provide the pricing information.

9

51. As noon approached on January 30, 2015, Lucania still had not provided Cooper with the pricing. Cooper made multiple telephone calls and sent text messages to Lucania, but received no response. Cooper sent Client C an email advising that she would provide a further update on Monday, February 2, 2015.

52. Cooper spent the entire weekend, on Saturday January 31, 2015, and Sunday, February 1, 2015, working on the proposal for Client C. Lucania finally provided some responses to clarify the pricing issues during that weekend; Taylor failed to provide any response or assistance.

53. At that point, Cooper still needed final approval of the proposal from either Lucania or Taylor, and she sent Lucania and Taylor a meeting maker for Monday morning. True to form, both men declined the meeting invitation.

54. Monday, February 2, 2015, came and went, and Cooper was unable to obtain any response as to final approval from Taylor or Lucania. As a result, Cooper missed Client C's deliverable timeline.

### **February 3, 2015 - Calero Demoted Cooper**

55. It appears that Calero's male executives failed to provide Cooper with the requested pricing information in order to force Cooper into a less lucrative position and allow a male employee to work in Cooper's former territory.

56. This scheme was perpetuated the next day, on February 3, 2015, when Taylor told Cooper that he felt that Cooper's passion was in Calero's channel and that Cooper should consider giving up her Regional Sales Director position to move to channel sales.

57. Calero's transfer of Cooper from Regional Sales Director to selling Calero's channel products constituted a demotion in title, responsibilities and commission pay.

58. As a Channel Manager, Cooper was no longer responsible for her own territory and no longer able to pursue high-dollar direct sales for which Calero paid a higher commission rate, and instead was forced to sell Calero's products to resellers for lesser contract prices subject to a lower commission rate.

59. Cooper also had a higher annual quota for channel sales, consisting of $4,000,000.00 in total contract value.

60. Additionally, Cooper was forced to start building new customer relationships from scratch.

61. In light of Cooper's excellent performance, she was shocked by Taylor's comments, but understood that she had no choice but to accept this demotion.

62. Taylor promised Cooper that she would retain the commissions that she had already earned toward her quota, including commissions for Client C and five other potential customers in or near the final closing stages.

63. Nevertheless, due to her demotion, Cooper was forced to give up several additional accounts that she initiated.

64. Calero permitted Gerry Henderson ("Henderson"), a male Regional Sales Director, to work in Cooper's former territory, and gave Henderson the accounts that Cooper had initiated. Henderson would now be entitled to a commission for closing those accounts.

65. On March 31, 2015, Cooper contacted Taylor and requested an update as to Client C, and offered to contact Ms. C to assure her that Calero was working on the statement of work. Taylor responded by telling Cooper not to contact Ms. C.

66. On April 17, 2015, Cooper learned that Calero was awarded the Client C contract.

67. On August 31, 2015, Client C executed the master services agreement with Calero, at which time Cooper earned the full commission with respect to this client pursuant to Calero's commission policy.

### September 16, 2015 to Present - Calero Terminated Cooper and Has Refused to Pay Her Commissions

68. Rather than pay Cooper the commission that she earned for Client C, the next day, on September 1, 2015, Calero advised Cooper that it was going to terminate her employment. Taylor and Waters telephoned Cooper to advise her of her pending termination. Cooper asked "on what grounds, certainly not performance?" Taylor did not respond and hung up the phone. Waters apologized, praised Cooper's job performance, and offered to provide her a reference.

69. Calero subsequently advised Cooper that the date of her termination would be September 16, 2015.

70. Pursuant to Calero's Master Sales Incentive Compensation Plan, which is incorporated by reference into the Letter Agreement, the commissions that Cooper earned in August 2015, including the commission with respect to Client C, were due on or before the last payroll transaction in September 2015, which fell on or about September 18, 2015.

71. To date, Calero has failed to pay Cooper commissions that she duly earned pursuant to her agreement with Calero, consisting of approximately $300,000.00 (earned as Regional Sales Director, inclusive of the contract with Client C), plus approximately $154,464.56 (earned for sales in the channel), for a total of approximately $454,464.56.

**Calero's Adverse Actions Were Based Solely on Cooper's Gender**

72. All of the officers and leadership team members at Calero were male.

73. Calero subjected Cooper to adverse actions constituting verbal abuse, a hostile work environment, demotion, termination, and failure to pay commissions due and owing based solely on her gender.

74. Calero did not subject male sales representatives to the same or similar verbal abuse or hostile work environment. Instead, male employees were permitted to conduct and conclude sales and were given appropriate assistance when needed.

75. Calero also did not subject similarly situated male sales representatives with sales at or below Cooper's level of performance to demotion or termination.

76. In fact, Cooper's sales performance was well above her minimum sales quotas, as follows.

    A. As regional sales director, Cooper delivered $5.6 million in revenue, which was significantly higher than her quota of $3.2 million.

    B. As Channel Manager for approximately seven months, Cooper delivered more than $5.6 million, well above her annual quota of $4 million for the channel. Moreover, Cooper delivered forty-four out of the ninety sales qualified leads generated for the channel.

77. Calero did not have any legitimate, nondiscriminatory reason for demoting Cooper, terminating Cooper, or failing to pay Cooper's commissions.

**Damages**

78. As a result of Calero's discrimination, Cooper sustained monetary damages constituting unpaid commissions totaling approximately $454,464.56; lost wages during her employment with Calero due to Cooper's reduced ability to earn commissions following her demotion to channel sales; and lost wages following the termination of her employment because she was unemployed for a period of time and was subsequently forced to take a position with lower pay.

79. Calero's discrimination also caused Cooper to suffer from increased blood pressure requiring medical treatment, as well as emotional suffering requiring professional counseling and prescription medications for anxiety.

**FIRST CAUSE OF ACTION**
**UNLAWFUL DISCRIMINATION ON THE BASIS OF SEX VIOLATION OF TITLE VII**

80. Cooper realleges paragraphs 1 through 79 as if fully set forth herein.

81. Calero's conduct as alleged herein constitutes unlawful discrimination based on Cooper's sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

82. Calero discriminated against Cooper in violation of Title VII when, based on her gender, it subjected Cooper to verbal abuse, a hostile work environment, harassment, and disparate treatment; demoted Cooper to a lesser position with diminished earning potential; terminated Cooper's employment; and failed to pay Cooper commissions due and owing.

83. As a result of Calero's conduct as alleged herein, Cooper has suffered and continues to suffer harm, including losses in compensation, pain and suffering, humiliation, mental anguish, and emotional distress.

84. Calero's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Cooper's rights.

85. As a direct result of Calero's discrimination, Cooper is entitled to all remedies available under Title VII, including compensatory damages, punitive damages, attorney's fees, costs, prejudgment interest, and other compensation.

## SECOND CAUSE OF ACTION
## UNLAWFUL DISCRIMINATION ON THE BASIS OF SEX
## IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW

86. Cooper realleges paragraphs 1 through 79 as if fully set forth herein.

87. Calero's conduct as alleged herein constitutes unlawful discrimination based on Cooper's sex in violation of the New York State Human Rights Law ("NYSHRL") and regulations.

88. Calero discriminated against Cooper in violation of the NYSHRL when, based on her gender, it subjected Cooper to verbal abuse, a hostile work environment, harassment, and disparate treatment; demoted Cooper to a lesser position with diminished earning potential; terminated Cooper's employment; and failed to pay Cooper commissions due and owing.

89. As a result of Calero's conduct as alleged herein, Cooper has suffered and continues to suffer harm, including losses in compensation, pain and suffering, humiliation, mental anguish, and emotional distress.

90. As a direct result of Calero's discrimination, Cooper is entitled to all remedies available under the NYSHRL, including compensatory damages, costs, prejudgment interest, and other compensation.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE EQUAL PAY ACT

91. Cooper realleges paragraphs 1 through 79 as if fully set forth herein.

92. Calero's conduct as alleged herein constitutes unlawful sex-based wage discrimination within the meaning of the Equal Pay Act of 1963 ("EPA") in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206, *et seq.*, as amended by the EPA, by providing her with lower pay than similarly situated male colleagues on the basis of her gender, even though Cooper performed similar duties requiring the same skill, effort, and responsibility of male counterparts.

93. Calero discriminated against Cooper in violation of the EPA by providing her with the decreased ability to earn commissions and by failing to pay Cooper commissions due and owing, thereby paying wages to Calero at a rate less than the rate at which it pays wages to male employees for equal work.

94. The differential pay between male and female employees was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

95. The foregoing constitutes a willful violation of the EPA.

96. As a result of Calero's conduct as alleged herein, Cooper has suffered and continues to suffer harm, including but not limited to lost earnings and other financial loss, as well as pain and suffering, humiliation, embarrassment, emotional and physical distress, and mental anguish.

97. As a direct result of Calero's discrimination, Cooper is entitled to all remedies available under the EPA, including compensatory damages, liquidated damages for all willful violations, prejudgment interest, attorney's fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## FOURTH CAUSE OF ACTION
## UNLAWFUL RATE OF PAY BECAUSE OF SEX, LABOR LAW § 194

98. Cooper realleges paragraphs 1 through 79 as if fully set forth herein.

99. Calero unlawfully paid Cooper a wage at a rate less than the rate at which male employees in the same establishment were paid for equal work on a job the performance of which requires equal skill, effort and responsibility, and which is performed under similar working conditions, in violation of New York Labor Law § 194.

100. Calero discriminated against Cooper in violation of Labor Law § 194 by providing her with the decreased ability to earn commissions and by failing to pay Cooper commissions due and owing, thereby paying wages to Calero at a rate less than the rate at which it pays wages to male employees for equal work.

101. The differential pay between male and female employees was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

102. Calero did not have a good faith basis to believe that its underpayment of wages was in compliance with the law.

103. Calero willfully violated Labor Law § 194.

104. As a direct result of Calero's violation of Labor Law § 194, Cooper is entitled to all remedies available under Labor Law § 198, including the full amount of the underpayment, attorney's fees, costs, prejudgment interest, liquidated damages equal

to one hundred percent of the total amount of the wages found to be due, and liquidated damages up to three hundred percent of the total amount of the wages found to be due for Calero's willful violation.

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE WAGE THEFT PREVENTION ACT

105. Cooper realleges paragraphs 1 through 79 as if fully set forth herein.

106. Calero unlawfully failed to pay Cooper wages due and owing and made improper deductions from Cooper's wages in violation of the Wage Theft Prevention Act, New York Labor Law §§ 190, *et seq*. (the "Wage Theft Prevention Act").

107. Calero violated the Wage Theft Prevention Act by failing to pay Cooper commissions due and owing, which constitutes an underpayment of wages and an improper deduction from Cooper's wages.

108. Calero does not have a good faith basis to believe its underpayment of wages to Cooper was in compliance with the law.

109. As a direct result of Calero's violation of the Wage Theft Prevention Act, Cooper is entitled to all remedies available thereunder, including the full amount of the underpayment, attorney's fees, costs, prejudgment interest, and liquidated damages equal to one hundred percent of the total amount of the wages found to be due.

## SIXTH CAUSE OF ACTION
## BREACH OF CONTRACT

110. Cooper realleges paragraphs 1 through 79 as if fully set forth herein.

111. Pursuant to the July 10, 2014 Letter Agreement between Cooper and Calero, Calero agreed to pay Cooper commissions pursuant to Calero's incentive compensation plan.

112. Calero's Master Sales Incentive Compensation Plan (the "Compensation Plan") is therefore incorporated by reference into the July 10, 2014 Letter Agreement.

113. The Compensation Plan provides that sales representatives are entitled to the payment of commissions for all products and services sold that are booked.

114. Cooper sold Calero products and services which were subsequently booked.

115. The Compensation Plan states that commissions are paid "in the last payroll of the month following the month in which the order is booked." (Compensation Plan, ¶ 3(H).)

116. To date, Calero has failed to pay Cooper commissions that she earned for orders that were booked.

117. Calero's failure to pay Cooper the commissions that she earned constitutes a breach of the July 10, 2014 Letter Agreement and the Master Sales Incentive Compensation Plan incorporated therein.

118. As a direct result of Calero's breaches of the parties' agreement, Cooper has suffered losses consisting approximately $454,464.56 in unpaid commissions.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Cooper hereby demands a trial by jury of all claims raised herein for which Cooper has a right to trial by jury.

WHEREFORE, Cooper demands judgment against Calero as follows:

A. Order Calero to pay compensatory damages including lost wages and compensation, future lost wages, unpaid commissions, employment benefits, and other

compensation denied or lost to Cooper, in an amount to be proven at trial, but not less than $75,000.00 exclusive of interest and costs;

      B.      Order Calero to pay compensatory damages for Cooper's mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress, in an amount to be proven at trial, but not less than $75,000.00 exclusive of interest and costs;

      C.      Order Calero to pay punitive damages in an amount to be determined at trial;

      D.      Order Calero to pay liquidated damages in an amount to be determined at trial;

      E.      Order Calero to pay attorney's fees, costs, and disbursements;

      F.      Order Calero to pay pre-judgment interest and post-judgment interest;

      G.      Such other and further relief as the Court deems just and proper.

Dated: August 24, 2016                **LECLAIR KORONA VAHEY COLE LLP**

                                                s/ Stacey E. Trien
                                          Steven E. Cole, Esq.
                                          Stacey E. Trien, Esq.
                                          *Attorneys for Plaintiff*
                                          28 East Main Street, Suite 1500
                                          Rochester, New York  14614
                                          Telephone:  (585) 327-4100
                                          E-mail:  scole@leclairkorona.com
                                          E-mail:  strien@leclairkorona.com